[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 14–13355; 14–13401
_____

D.C. Docket No. 8:12-cv-00755-RAL-EAJ


YELLOW PAGES PHOTOS, INC.,

Plaintiff–Counter Defendant–Appellee,

versus

ZIPLOCAL, LP,

Defendant–Counter Claimant,

YELLOW PAGES GROUP, LLC,

Defendant–Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(July 30, 2015)

Before MARTIN and ROSENBAUM, Circuit Judges, and COOGLER,[*] District Judge.

COOGLER, District Judge:

Yellow Pages Group, LLC appeals from a $123,000 judgment against it in favor of Yellow Pages Photos, Inc., following a jury verdict in a copyright infringement trial. Yellow Pages Photos, Inc. cross appeals, arguing that it is entitled to a new trial on damages due to the alleged error of the district court in several of its discovery, evidentiary, and procedural rulings. After careful review of the record and briefs of the parties, and having the benefit of oral argument, we affirm the district court on all issues raised on appeal.

## I.

## A.

The facts presented at trial are as follows. In the late 1990s, Trent Moore ("Moore"), an amateur photographer and former owner of a yellow pages ad production company, founded Yellow Pages Photos, Inc. ("YPPI"), to create and license stock photographs tailored to the yellow pages industry. YPPI set out to create stock photos that were relevant to the directory industry from a subject matter perspective. By 2004, YPPI owned a library of over 4,000 copyrighted photos that for efficiency were grouped into collections—also referred to

[*] The Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama, sitting by designation.

throughout as "headings"—that generally corresponded to yellow pages headings, such as "Plumbers," "Roofers," "Attorneys," or "Landscape." In Moore's words,

> [S]ince I was going to provide imagery specifically to the yellow pages industry, the idea was to develop images such that when they were looking for the image and the heading and the artwork requested, everything has the same vernacular. And so efficiencies can be made by okay, I can go here and I'll have 50 of these, a hundred of these different looks.

[Doc. 423 at 66.] Moore also explained that the stock photos were not redundant in that every photo could be used by a publisher: "[T]hey were shot in such a way that each image could be used to its fullest. . . . What we wanted to do was have ten different photos of this, not one guy ten ways. We need ten guys one way." [*Id.* at 65–67.]

In March of 2004, Moore met with John Woodall ("Woodall"), the CEO of phone book publisher Ziplocal, LP ("Ziplocal"), then called Phone Directories Company. Woodall found Moore's product interesting because it consisted of a large number of "images of things organized by Yellow Page headings." [Doc. 425 at 40–41, 77.] As Woodall put it, "I had never seen at that point a collection organized the way that we actually did business, which was dealing with businesses by heading." [*Id.* at 41.] At that meeting, Moore and Woodall reached an agreement for the use of YPPI's photos. YPPI's contract with Ziplocal consisted of two documents, the terms of which were agreed to during the meeting. The first

3

was titled "Site License Purchase Agreement" ("SLPA"). The second was titled "End User License Agreement" ("EULA").

The SLPA is a one-page, bullet-pointed document signed on March 15, 2004, by Moore and Woodall that provided, among other things, that for the price of $875 per CD-ROM disk, "[Ziplocal] agrees to purchase all current titles as well as all new relevant headings as they become available, up to the first 200 Headings. YPPI will ship 1–2 headings per month." [Joint Trial Exhibit 2.] The SLPA thus contemplated an initial purchase of a license to use, and delivery of, YPPI's photos that were then available, followed by additional purchases and deliveries of an additional 120 headings over time. The SLPA provided for an unlimited number of "authorized users" of the photos, and although it permitted Ziplocal to use any type of "server or information system [necessary] to facilitate multiple user simultaneous access," it required Ziplocal to protect the photos from "unauthorized distribution to unlicensed users." [*Id.*] The SLPA, which refers to itself internally as "this agreement," also refers to another agreement called "the license agreement." [*Id.*] Both Moore and Woodall testified that this reference to "the license agreement" was to the EULA. There was no testimony to the contrary, and no dispute the SLPA was a binding contract between YPPI and Ziplocal.

The EULA is a two-page, unsigned document that contained terms in addition to, and that expanded upon, the terms of the SLPA, including the

4

following, relative to the use and transfer of photos: "[Ziplocal] may not transfer these images to any outside parties or individuals unless authorized by YPPI. All users must be Employees of [Ziplocal]." [Joint Trial Exhibit 20.] The EULA also limited the number of users of the photos to 40, indicated that opening the package containing the photos "indicates your acceptance of the terms and conditions set forth," and stated that "if you do not agree with these conditions YPPI does not grant license and you should return the unopened packages within 10 days for a full refund." [*Id.*]

Moore testified that there were two contracts because, "There's the purchase agreement which details, you know, things like how many CDs or images are going to be purchased and there's a license agreement that details the restrictions and use." [Doc. 424 at 19.] Woodall's testimony was also that both the SLPA and EULA were contracts of YPPI and Ziplocal and that the EULA was simply "the detail of the license agreement behind the [SLPA]." [Doc. 425 at 44.] Notwithstanding persistent cross examination, Woodall repeated over and over that the EULA was an agreement between YPPI and Ziplocal. [*Id.* at 98–100.] Moore and Woodall also testified that the SLPA and EULA were agreed to contemporaneously. Moore stated that "when I consummated the deal with John Woodall, [the SLPA and EULA] were together." [Doc. 424 at 19–20.] Woodall testified that he saw the SLPA and EULA around the same time. [Doc. 425 at 44.]

5

At their meeting in March 2004, Moore gave Woodall a hard drive with the first 4,000 photos, or 80 collections, on it. In April 2004, Moore sent the first CD of additional photos to Ziplocal, and the package contained the EULA. From 2004 to 2009, Ziplocal made payments and received in installments more collections of photos, until it had acquired YPPI's entire library of 10,411 photos grouped into 178 headings organized by subject matter. Each time Moore sent a new collection of around 50 photos burned onto a CD, he would enclose the EULA in the packaging. Moore testified that "[e]ach time I delivered images, there would be a license agreement attached to the disks." [Doc. 424 at 58.] Lee Lott, the Director of Production and later the Vice President of Operations at Ziplocal, testified that "[The EULA] was basically put in with his CDs when he sent them in a package. So it was there all the time." [Doc. 425 at 189–90.] Moore testified that he never changed the terms of the EULA.

Yellow Pages Group, LLC ("YPG") was not a party to either the SLPA or the EULA. YPG and Ziplocal did not start doing business until six years later, in 2010, when YPG sold its phone books to Ziplocal and subcontracted with Ziplocal so that YPG's employees could provide support in producing Ziplocal's phone books. YPG employees assembled and paginated the digital pages to prepare them for printing, modified existing ads by updating phone numbers and addresses, and created new ads, tasks that Ziplocal had previously done in-house. The relationship

6

between Ziplocal and YPG was governed by an Outsourcing Agreement signed in November 2010. The agreement provided that any work performed by YPG for Ziplocal would not infringe third-party intellectual property rights. As part of their agreement, Ziplocal provided YPG with digital copies of its phone books that included photos that had been licensed from YPPI. In updating those books, YPG used some of YPPI's licensed photos. YPPI was never asked to consent to any transfer of its photos by Ziplocal to YPG, or to the use of its photos by YPG. In any event, and as Moore admitted at trial, Ziplocal's outsourcing to YPG resulted in YPPI's photos being used as intended under the SLPA, which was only in Ziplocal publications. [Doc. 424 at 225–26.]

In 2011, YPPI discovered that Ziplocal outsourced its graphics functions to YPG, and that YPG was using YPPI's photos without a license. YPPI sent Ziplocal a cease and desist letter, containing a copy of the EULA, which required all "users" of YPPI's photos to be employees of Ziplocal's. When YPG was notified of the particular ads that YPPI thought were infringing, Ziplocal and YPG removed them from the next edition of the phone books, substituting photos licensed from another company, Getty Images, for YPPI's photos. Moore testified that it took many months to identify which of his photos he thought YPG and Ziplocal were infringing because he had to compare them to his master set, and that he was working on identifying infringing photos right up until the time of trial. On April 9,

2012, YPPI commenced this action. Ziplocal and YPG were still using YPPI's photos to build ads after the commencement of the lawsuit.

## B.

YPPI filed a two-count complaint, for breach of contract against Ziplocal, and for infringement against both Ziplocal and YPG under the United States Copyright Act of 1976, 17 U.S.C. § 101, *et seq.* After the claims survived cross motions for summary judgment, the case was tried to a jury from March 17 to 27, 2014. YPPI contended at trial that its contract with Ziplocal was comprised of two documents, the SLPA and the EULA, that both the SLPA and the EULA prohibited transfer of YPPI's photos and restricted use of the photos to employees of Ziplocal, and that the terms of both the SLPA and EULA were breached when Ziplocal transferred photos to, and permitted use of the photos by, YPG. On the other hand, Ziplocal and YPG claimed that only the SLPA was the operative contract between the parties, and that the EULA was invalid. In Ziplocal and YPG's view, since their conduct did not violate the terms of the SLPA, they could not have infringed YPPI's copyrights.

During trial, both parties requested that, before the case was submitted to the jury, the district court decide, based on the evidence introduced at trial, how many individual photos constituted a "work" as that term is defined in the Copyright Act for purposes of computing statutory damages. The court ruled that each of YPPI's

178 collections of photos relating to phone directory subject matter such as "Appliances," "Attorneys," etc., was a work for statutory damages purposes, rejecting YPPI's contention that each of its 10,411 individual photos was a work. The court reached this conclusion by considering how YPPI arranged the photos for marketing purposes, noting that Moore had testified that the purpose for grouping his photo collections by subject matter heading, rather than marketing individual photos, was for customer appeal and efficiency. The court also considered how YPPI registered the photos with the Copyright Office, under the 178 titles, grouping various title collections together on 44 different registration applications, how it delivered the photos to Ziplocal, in that the SLPA provided that YPPI would sell "up to the first 200 Headings" initially and would subsequently "ship 1–2 headings per month," and how it described the photos in its complaints as collections, pointing out that YPPI did not take the position until it filed its Third Amended Complaint that each photograph constituted a single work.

At the close of the evidence, the court used YPPI's proposed jury instructions and verdict form in submitting the case to the jury. In response to questions on the verdict form, the jury first found by a preponderance of the evidence that "the EULA is a valid and binding contract between YPPI and Ziplocal." It then found that Ziplocal breached "its contract" with YPPI. The jury then filled in a blank to award YPPI zero dollars on its breach of contract claim. In

9

response to further questions, the jury found both Ziplocal and YPG to be willful infringers of YPPI's copyrights and that 123 of YPPI's 178 works had been infringed. The jury then awarded one dollar in actual damages and zero dollars in statutory damages against Ziplocal, and zero dollars in actual damages and $123,000 in statutory damages against YPG. Finally, the jury found that Ziplocal was a contributory infringer to YPG's copyright infringement and awarded $100,000 in actual damages and zero dollars in statutory damages to YPPI on the contributory infringement claim.

After trial, Ziplocal and YPG renewed their motions for a judgment as a matter of law, which were denied by the district court. YPPI made its election between actual and statutory damages, as it was authorized to do under the Copyright Act, electing to recover 1) $100,001.00 in actual damages from Ziplocal and 2) $123,000.00 in statutory damages from YPG. YPPI filed a motion for attorneys' fees and nontaxable and taxable costs, seeking over $2 million. The district court denied YPPI's motion without prejudice, pending the outcome of this appeal. YPG timely appealed the district court's denial of its post-trial renewed motion for a judgment as a matter of law to this Court. Ziplocal also appealed, but its appeal was dismissed for want of prosecution. YPPI cross appealed several of the district court's discovery, evidentiary, and procedural rulings. We have jurisdiction pursuant to 28 U.S.C. § 1291.

10

## II.

## A.

YPG argues that it is entitled to a judgment as a matter of law for several reasons, the first being that the SLPA permitted Ziplocal to outsource the use of YPPI's photos to YPG, irrespective of the EULA's prohibition on transferring photos to non-employees, and as such, YPG's assistance to Ziplocal in publishing its phone books by using YPPI's photos was not copyright infringement. Alternatively, YPG contends that even if the EULA could override the SLPA, it is still entitled to a judgment as a matter of law because the EULA was invalid for several reasons: Ziplocal did not give consideration for it, YPPI did not present evidence that each EULA accompanying the attached CD of photos was accepted by someone at Ziplocal with authority to bind the company, and YPPI did not prove that the EULA applied to any of the 123 works the jury found YPG infringed. Finally, YPG contends that it is entitled to a judgment as a matter of law because it believes that YPPI did not present evidence that it acted willfully in infringing YPPI's copyrights. As explained further in this opinion, the jury's verdict is not due to be disturbed for any of the reasons set forth by YPG.

## 1.

Before addressing YPG's arguments, we must take up YPPI's contention that YPG lacks standing to make several of those arguments in this appeal. *See*

11

*Doe No. 1 v. United States*, 749 F.3d 999, 1003 (11th Cir. 2014) ("We review *de novo* whether we have jurisdiction . . . before addressing the merits.").

In addressing YPPI's claims, the jury had to determine what documents constituted the contract between YPPI and Ziplocal (i.e., just the SLPA, or the EULA as well), what the terms of the contract were, and whether Ziplocal breached its contract with YPPI, before it could address whether YPG and Ziplocal infringed YPPI's copyrights. Because Ziplocal has no pending appeal, YPPI asserts that YPG, not a party to the contract between Ziplocal and YPPI, and nowhere arguing that it is an intended third-party beneficiary of the contract, lacks "standing" to assert arguments relating to the validity and interpretation of the SLPA or the EULA. YPPI's contention is based primarily on this Court's previous holding that if a plaintiff is not an intended third-party beneficiary of a contract, the plaintiff lacks standing to sue under the contract and that, consequently, the court lacks jurisdiction. *See Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932–33 (11th Cir. 2013). However, as explained below, YPPI's jurisdictional argument is misplaced, as YPG without question possesses standing to litigate this appeal.

"[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992). Accordingly, standing "is the

threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 2205 (1975). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Id*. A litigant is so entitled only when he has "such a personal stake in the outcome of the controversy to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." *Baker v. Carr*, 369 U.S. 186, 204, 82 S. Ct. 691, 703 (1962). A plaintiff must meet three requirements in order to establish Article III standing: injury in fact—"a harm that is both concrete and actual or imminent, not conjectural or hypothetical," causation—"a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant," and redressability—"a substantial likelihood that the requested relief will remedy the alleged injury in fact." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771, 120 S. Ct. 1858, 1861–62 (2000) (internal quotation marks, citations and alterations omitted). To establish standing, a litigant ordinarily "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499, 95 S. Ct. at 2205. This "general prohibition on a litigant's raising another person's legal rights" is a "prudential standing" doctrine, "not derived from Article III." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014). "[T]his

13

obligation on the court to examine its own jurisdiction," including whether the parties have standing, "continues at each stage of the proceedings . . . ." *Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1422 (11th Cir. 1995).

YPPI's assertion that YPG lacks "standing" is problematic because YPG advances its interpretation of the SLPA and the EULA not as a plaintiff in pursuit of a contract claim—indeed, YPG has no breach of contract claim—but in its defense against the copyright infringement claim levied against it by YPPI. To be sure, the requirement that a party establish its standing to litigate applies not only to plaintiffs but also defendants. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 64, 117 S. Ct. 1055, 1067 (1997) (stating that "[s]tanding to sue *or defend* is an aspect of the case-or-controversy requirement" and "[s]tanding to defend on appeal in the place of an original defendant, no less than standing to sue, demands that the litigant possess a direct stake in the outcome") (emphasis added and internal quotation marks omitted). Nonetheless, the issue of standing in civil litigation normally arises in the context of the plaintiff's standing to sue, and not in the defendant's standing to defend against suit. *See* 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531 (3d ed. 2014) (noting that the party focused upon is "almost invariably the plaintiff" and that "ordinarily the role of defendants is considered only in determining whether they have caused the injury complained of and whether an order directed to them will redress that

14

injury"). For example, the cases relied upon by YPPI for determining whether YPG has established standing in this case are cases in which the plaintiff's standing to sue on a contract was challenged, not the defendant's standing to assert a defense. *See, e.g.*, *Interface Kanner*, 704 F.3d at 932. The concept of the defendant's standing does not typically arise because the requirement that a defendant possess standing is almost always satisfied by the plaintiff's claim for relief against that defendant. After all, any defendant against whom relief is sought will generally have standing to defend due to its exposure to an adverse judgment, the threat of which is imminent.

In the instant case, the justiciable controversy before the Court is whether YPG infringed YPPI's copyrights in its photos. YPG meets the requirement that it possess standing to litigate this controversy, as it has a concrete and actual interest in avoiding a judgment being entered against it on YPPI's copyright infringement claim, an interest that will be directly affected by the outcome of this appeal. YPG unquestionably has standing.

Moreover, whether YPG can assert a defense to YPPI's copyright infringement claim based on a particular interpretation of the SLPA and the EULA is simply not an issue of "standing" in the same sense that the term "standing" is used in resolving a challenge to a plaintiff's ability to pursue a claim. This point is illustrated in *Excel Willowbrook, L.L.C. v. JPMorgan Chase Bank, National*

*Association*, 758 F.3d 592 (5th Cir. 2014), where Judge Edith Brown Clement observed in her concurrence that a litigant's request that a court interpret a third-party contract in a manner favorable to its interests is not a matter of that litigant's Article III standing but is instead a question of contract law. *Id.* at 604. In that case, the owners (the "Landlords") of tracts of land that had been leased to a bank before its failure brought actions to enforce the leases against the purchaser of the bank's assets ("Chase"). *Id.* at 595–96. The Landlords sought to enforce the leases by virtue of the FDIC's conveyance of the failed bank's assets and liabilities to Chase. *Id.* The FDIC argued that the Landlords lacked standing to interpret or enforce the contract of conveyance between the FDIC and Chase because they were neither parties to it nor intended third-party beneficiaries. *Id.* at 596. The court held that the Landlords were not intended third-party beneficiaries but that they nonetheless possessed standing by virtue of their privity of estate with Chase. *Id.* at 599–600. Judge Clement observed separately that the Landlords made the requisite showing to demonstrate the injury, causation, and redressability components of standing because the assignment of the leases from the failed bank to the FDIC to Chase directly caused them to lose rental income, and a money judgment against either the FDIC or Chase would redress their loss. *Id.* at 603–04. She rejected the FDIC's argument, writing:

> The FDIC's counterargument that non-third-party beneficiaries
> cannot interpret and enforce a contract against the understanding of

16

the contracting parties improperly tries to stretch a question of contract law into a dubious principle of constitutional law. Non-third-party beneficiaries to contracts usually cannot show that they have suffered an injury to a legally protected interest because contract law does not recognize and compensate non-third-party beneficiaries for the injuries that they often suffer when a contracting party fails to comply with a contract. But when jurisdiction is otherwise proper, there is no inherent bar prohibiting a stranger to a contract from asking the court to interpret a contract that has bearing on its case.

*Id.* at 604. Similarly here, having already determined that YPG has standing, there is no jurisdictional bar to YPG asking this Court to interpret YPPI's licensing agreement with Ziplocal. That agreement precipitated the copyright infringement claim YPPI now asserts against YPG, and whether YPG will be absolved of liability or made to pay the damages award depends in part on this Court's interpretation of the agreement at issue. Judge Clement's conclusion in *Excel Willowbrook* that the Landlords did not have a standing problem is exceptionally persuasive given our facts, considering that the non-third party beneficiaries asking the court to interpret the contract in *Excel Willowbrook* actually initiated the litigation, while here, YPG offers its interpretation of the SLPA and the EULA as a defendant—YPG is only in court because YPPI put it there. *Cf Culhane v. Aurora Loan Serv. of Neb.*, 708 F.3d 282, 290 (1st Cir. 2013) (while noting that "[i]t is true that a nonparty who does not benefit from a contract generally lacks standing to assert rights under that contract," making clear that a debtor "could challenge an assignment as a defense upon being haled into court by the assignee seeking to

17

collect on her debt") (citing 6A C.J.S. *Assignments* § 132 (2012)). Simply put, the rule from *Interface Kanner* preventing a non-party from enforcing a contract by seeking damages or specific performance under the contract is not applicable in the instant case. Here, YPG is not seeking to enforce rights it believes it has under the SLPA and the EULA but is merely asking the Court to interpret a contract that has some bearing on its defense to YPPI's copyright infringement claim. YPG's chosen defense is not a matter of jurisdictional consequence.

Finding no standing problem, we pause to satisfy ourselves that YPG can nonetheless assert its defense even though it was not in privity of contract with YPPI.[1] To the extent that this issue is properly before us, we find that YPG may do so. Outsiders to contracts have successfully asked courts to interpret those contracts for various purposes. For example, courts have allowed defendants to rely on written contracts, to which they were neither parties nor intended beneficiaries, in support of their defenses, and have rejected, pursuant to the parol evidence rule, the contracting parties' testimony, which contradicted the written terms of the contract. *See United States v. Ivey*, 414 F.2d 199, 203 (5th Cir. 1969) (in a taxpayer suit against the United States to recover income taxes paid, allowing the United States to rely on a contract between a cotton grower and his agent, to

---

[1] While it could be said that this issue is inherent in YPPI's position that YPG lacks standing because it is not a party to the contract between YPPI and Ziplocal, YPPI did not articulate this issue as we do here. To the extent it was not waived, we address its merits.

which the United States was not a party, as evidence to support its defense that certain monies received by the grower pursuant to the contract were advances or loans and not partial sales proceeds, and thus taxable);[2] *Clark v. United States*, 341 F.2d 691, 693 (9th Cir. 1965) (similarly allowing the United States to rely on the written terms of a third-party employment contract between the plaintiff-taxpayer and his employer as evidence that income taxes were properly owed and stating, "The dispositive issue is the agreement. It is immaterial that the litigation which gives rise to the issue is between a party to the writing and a stranger."). Further, when intellectual property doctrines are at issue, defendants charged as infringers often assert defenses involving the validity and interpretation of licenses to which the defendants were not parties. For example, in *UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175 (9th Cir. 2011), the doctrine of "first sale" embodied in § 109(a) of the Copyright Act was at issue, meaning that if a copyrighted work is sold rather than licensed, the copyright owner's copyright rights are exhausted and the downstream purchaser who uses the work is not an infringer. *Id.* at 1179–80 (citing 17 U.S.C. § 109(a)). The defendant in that case argued that under the first sale doctrine, he was not an infringer of the plaintiff's copyrights because the plaintiff's agreement with the original recipients of its promotional CDs was properly characterized as a sale rather than a license. *Id*. at 1179. The court interpreted the

[2] In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981.

copyright owner's agreements with the original recipients of the CDs as a sale, rather than a license, ruling for the defendant. *Id.* at 1180. This required the court to interpret that agreement and determine its validity. *See id.* Similarly, in *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 128 S. Ct. 2109 (2008), LG had licensed a patent portfolio to Intel, who in turn sold computer chipsets to Quanta. *Id.* at 623–24, 128 S. Ct. at 2114. The Supreme Court addressed the doctrine of "patent exhaustion," which provides that the initial authorized sale of a patented item terminates all patent rights to that item. *Id.* at 625, 128 S. Ct. at 2115. That doctrine enabled Quanta, who was sued for patent infringement, to argue that the license between LG and Intel was such that the downstream users of LG's products were permitted to use the products for their intended use without a license. *Id.* at 628, 128 S. Ct. at 2117. The Court had to interpret the license between LC and Intel to decide the case as to Quanta. Like the "first sale" doctrine, the "patent exhaustion" doctrine enabled downstream users who were not parties to initial contracts to make arguments about the validity of those contracts. In sum, we also see no reason based upon contract law why YPG should not be permitted to assert its arguments. We now turn to YPG's appeal.

## 2.

We review the denial of a motion for a judgment as a matter of law *de novo* and apply the same standards as the district court. *Skye v. Maersk Line, Ltd. Corp.*,

751 F.3d 1262, 1265 (11th Cir. 2014). We will reverse the district court's denial of a motion for a judgment as a matter of law "only if the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." *Id.* (quotation marks omitted). "We will not second-guess the jury or substitute our judgment for its judgment if its verdict is supported by sufficient evidence." *Id.* (quotation marks omitted).

YPG's first contention is that the SLPA permitted Ziplocal to outsource the use of YPPI's photos to contractors like YPG, irrespective of the EULA's prohibition on transferring photos to non-employees, and as such, YPG's assistance to Ziplocal in publishing its phone books by using YPPI's photos was not copyright infringement. However, the jury's verdict to the contrary is supported by sufficient evidence.[3] As the district court instructed the jury, there was a dispute between YPPI and Ziplocal as to what constituted the contract— YPPI claimed the contract was comprised of both the SLPA and the EULA together, while Ziplocal claimed that only the SLPA was the contract, and that the EULA was invalid. Pursuant to YPPI's theory, if the jury found that the EULA was a valid and binding contract of Ziplocal's, it must be construed together with the SLPA, because where multiple agreements are entered into by the same parties,

---

[3] YPPI asserts in its response brief that YPG waived this particular argument by not first asserting it at the close of all of the evidence in its motion for a judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). We assume, without deciding, that YPG properly preserved this argument because we find that YPG's argument fails substantively.

21

at the same time, concerning the same transaction or subject matter, they are generally construed together as a single contract. Florida contract law supports YPPI's theory. *See Quix Snaxx, Inc. v. Sorensen*, 710 So. 2d 152, 153 (Fla. Dist. Ct. App. 1998); *Clayton v. Howard Johnson Franchise Sys., Inc.*, 954 F.2d 645, 648 (11th Cir. 1992). There was sufficient evidence presented to support YPPI's theory that the SLPA and the EULA should be construed together. For example, the testimony of not only YPPI's president, Moore, but also Ziplocal's president, Woodall, was that they reached an agreement in March 2004 *that consisted of both the SLPA and the EULA*. [Docs. 424 at 19 (Moore's testimony); 425 at 44, 98–100 (Woodall's testimony, i.e., that the EULA was an agreement of YPPI and Ziplocal and that the EULA was simply the "license agreement behind the [SLPA]").] Both Moore and Woodall also testified that that the SLPA and the EULA were agreed to at the same time. [Docs. 424 at 19–20 (Moore's testimony); 425 at 44 (Woodall's testimony).] Moreover, the jury never heard any testimony that Woodall rejected or refused to enter into the EULA.

Further, the district court charged the jury that in deciding the meaning of the disputed terms of the contract, it should consider how the parties acted before and after the contract was created. Terms in the SLPA such as "authorized users," "unauthorized distribution," "unlicensed users," and "the license agreement" were not defined in the SLPA, and the jury was instructed that there was a dispute

between YPPI and Ziplocal as to the meaning of these terms. The jury heard that YPPI's position was that these particular terms in the SLPA should be construed consistently with the EULA to mean that "authorized users" in the SLPA means "employees of [Ziplocal]," "unlicensed users" in the SLPA means outside parties or individuals who are not employees of Ziplocal, "unauthorized distribution" means transfer of the photos without authorization by YPPI, and the term "the license agreement" in the SLPA refers to the EULA. If these constructions were adopted by the jury, the SLPA could, on its face, have been found to prohibit the use of YPPI's photos by non-employees, just as the EULA does, which is even referenced in the SLPA as "the license agreement." *See Quix Snaxx*, 710 So. 2d at 153 ("Where a writing expressly refers to and sufficiently describes another document, the other document, or so much of it as is referred to, is to be interpreted as part of the writing."). Sufficient evidence was presented to support these constructions as argued by YPPI, such as the actions of Ziplocal over the years in continuing to accept, pay for, and use each collection of photos sent by YPPI, each time in packaging containing a EULA. In sum, the evidence supports the jury's conclusion that Ziplocal breached its contract—consisting of the SLPA and EULA together—with YPPI by transferring YPPI's photos to YPG.

23

**3.**

Nor do we find merit in any of YPG's contentions that it was entitled to a judgment as a matter of law because the EULA was an invalid contract. YPG first argues that there was no benefit provided to Ziplocal by the EULA that it did not already get through the SLPA, and the EULA actually contained more restrictive provisions than the SLPA. To the contrary, there was a legally sufficient evidentiary basis for the jury to conclude that there was consideration for the EULA. As noted in the previous section, a reasonable jury could have construed the SLPA and EULA together as one contract, a finding that was supported by the evidence at trial. Because there was consideration for the SLPA, in the form of Ziplocal paying YPPI for the photos and promising to abide by the contract restrictions, there was consideration for the EULA as well, which was even referenced in the SLPA as "the license agreement." Indeed, as YPPI delivered more photos for years after the initial agreement between Moore and Woodall, each time accompanied by the EULA, Ziplocal continued to pay. YPG has not demonstrated a lack of evidence of consideration such that the judgment in favor of YPPI would be brought into question.

YPG next contends that the EULA is invalid because it was not agreed to by anyone with authority to bind Ziplocal for shipments of photos subsequent to the first delivery of the initial hard drive to Woodall in April 2004. Again, there was

24

sufficient evidence presented for the jury to conclude otherwise. Woodall testified

that the EULA was an agreement of Ziplocal and that he agreed to its terms.

Moore's testimony that the terms of the EULA never changed after the initial

meeting in March 2004, was uncontroverted at trial. Woodall, as Ziplocal's

president, unquestionably had authority to commit Ziplocal to those terms. The

jury also heard testimony that Mr. Lott, the Director of Production and later the

Vice President of Operations at Ziplocal, received the EULA with each additional

CD shipment, and that after Mr. Lott left Ziplocal, Geri Suster, the former Chief

Operating Officer at Ziplocal, also received the EULA with additional CD

shipments. YPG argues that there was no showing that Mr. Lott or Ms. Suster was

authorized to agree to the terms of the EULA when they opened the packages.

However, given that Woodall was aware that Mr. Lott was receiving CD shipments

on behalf of Ziplocal, this argument is without merit. *See Computel, Inc. v. Emery*

*Air Freight Corp.*, 919 F.2d 678, 683 (11th Cir. 1990) (a principal is bound by the

acts of his agent where the principal is informed and approved of the act).[4] Further,

the jury heard nothing to indicate that Woodall ever rejected or refused to enter

into the EULA, but it did receive evidence that he was aware that Mr. Lott was

---

[4] There was also a question raised at trial about who actually opened the mail for Mr. Lott. When asked "Do you know who from [Ziplocal] would have received those shipments," Woodall answered, "It would have come directly to either Janice Riggs, the vice president of production; Lee Lott, the production manager, or Charlene Davis, his assistant." [Doc. 425 at 48–49.] If officers of Ziplocal delegated authority to agents within their company to open mail for them, they are bound by the acts of those agents as if they had opened the mail themselves. *See Computel*, 919 F.2d at 683.

25

receiving and using the photos. Therefore, Mr. Lott's continued acceptance of the EULA with shipments was binding on Ziplocal, just as the same is true for Ms. Suster after she took over Mr. Lott's position. YPG has failed to demonstrate how the evidence points in its favor such to necessitate a reversal of the judgment in favor of YPPI.

YPG also asserts that there was no evidence presented that the EULA governed the first 4,000 photos initially delivered on March 15, 2004, by YPPI to Ziplocal. YPG argues that the EULA could not have applied to this initial delivery of photos, because the photos were on a hard drive as opposed to a CD, and the EULA was not affixed to the hard drive, as it was to the subsequent CD shipments. YPG's argument again disregards the testimony at trial that led the jury to construe the SLPA together with the EULA, rather than each in isolation, and YPG does not dispute that the SLPA applies to all 10,411 photos. Moreover, Moore testified that the EULA governed all 10,411 of the photos at issue in this lawsuit. Moore also testified that he and Woodall agreed to the terms of the EULA when he delivered the hard drive containing the initial set of photos with the EULA, on March 15, 2004. Woodall's testimony confirmed this agreement, in that he stated that the EULA was the "license agreement behind the [SLPA]," that the EULA was an agreement of YPPI and Ziplocal, and that he saw the two agreements at around the same time. [Doc. 425 at 44, 98–100.] YPG's argument that the EULA could not

26

have applied to the initial delivery of photos because there was no package with an attached EULA containing a CD for Ziplocal to open, a specific mode of acceptance set forth in the EULA, disregards the intent of YPPI and Ziplocal to reach an agreement on March 15, 2004, and for it to apply to the initial 4,000 photos. Florida law provides that a valid contract is formed, notwithstanding a deviation from the offeror's designated mode of acceptance, if there was a meeting of the minds and the offer was indeed accepted. *See Caldwell v. Snyder*, 949 So. 2d 1048, 1050 (Fla. Dist. Ct. App. 2006) (offer accepted even though cashier's check was provided instead of wire transfer or cash as required by "non-negotiable conditions"). Further, the offeror is free to waive a designated mode of acceptance. *See id.* In any event, the EULA does not provide that opening a package containing a CD with an attached EULA is the *only* way to accept the EULA. In sum, the only testimony at trial was that there was a meeting of the minds as to the terms that would govern all photos delivered to Ziplocal by YPPI on the first day and thereafter, and that the SLPA and EULA contained those terms. There was sufficient evidence for the jury to conclude that all 10,411 photos licensed to Ziplocal were governed by the agreement reflected in the SLPA and the EULA.

## 4.

YPG's final contention is that it is entitled to a judgment as a matter of law because there was no evidence presented at trial supporting the jury's finding that

it willfully infringed YPPI's copyrights. The Copyright Act entitles a copyright owner to recover actual damages suffered, as well as any profits made by the defendant, that are the result of the infringement. 17 U.S.C. § 504(b). However, under § 504(c)(1) of the Act, an owner may elect to recover statutory damages in lieu of any other form of monetary relief. The Copyright Act's statutory damages provision is designed to discourage wrongful conduct. *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233, 73 S. Ct. 222, 225 (1952). The range of statutory damages is between $750 and $30,000 for each infringed work, 17 U.S.C. § 504(c)(1), but the Act also allows "the court in its discretion [to] increase . . . award[s] of statutory damages" in cases involving willful infringement to $150,000 per work, *id.* § 504(c)(2). This Court has stated that willfulness under the Copyright Act "means that the defendant 'knows his actions constitute an infringement; the actions need not have been malicious.'" *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 851 (11th Cir. 1990) (quoting *Broadcast Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 236 (5th Cir. 1988)). Numerous other circuits have held that a finding of willfulness under the Copyright Act is also appropriate where a defendant recklessly disregarded the possibility that it was infringing a copyright. *See Graper v. Mid-Continent Cas. Co.*, 756 F.3d 388, 394–95 & n.7 (5th Cir. 2014); *N.A.S. Import, Corp. v. Chenson Enters., Inc.,* 968 F.2d 250, 252 (2d Cir.1992) (holding that a finding of "reckless disregard of the

28

copyright holder's rights (rather than actual knowledge of infringement) suffices to warrant [an] award of enhanced damages"); *Video Views, Inc. v. Studio 21, Ltd.*, 925 F.2d 1010, 1020–21 (7th Cir.1991) (holding that the term "willful" encompasses the "reckless disregard of the copyright owner's right"); *RCA/Ariola Intern., Inc. v. Thomas & Grayston Co.*, 845 F.2d 773, 779 (8th Cir.1988) (holding that "willfully" under the Copyright Act encompasses reckless disregard). As opined by the Fifth Circuit Court of Appeals,

> Although the Supreme Court has not directly addressed the definition of "willful" under the Copyright Act, "the general rule [is] that a common law term in a statute comes with a common law meaning, absent anything pointing another way." *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 58, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007) (internal citation omitted). Because the common law construction of the term "willful" covers behavior that is "wanton" or "reckless[,]" the "standard civil usage" should as well. *Id.* Thus, when "willfulness is a statutory condition of civil liability, [it] cover[s] not only knowing violations of a standard, but reckless ones as well." *Id. Safeco* mandates that we interpret "willful" under § 504(c)(2) as encompassing more than just "knowing" infringements.

*Graper*, 756 F.3d at 394–95 (footnote omitted). We agree with the Fifth Circuit and others that willful copyright infringement under § 504(c)(2) encompasses reckless disregard of the possibility that one's actions are infringing a copyright.

There were sufficient facts at trial to support a finding of willful infringement based on YPG's reckless disregard for the possibility that it might be

infringing on YPPI's copyrights. Michelle Meloy, a senior manager in YPG's directory services department and former Creative Services Manager, admitted that YPG never received authorization to use YPPI's photos. Notwithstanding this lack of authorization, Ms. Meloy testified that YPG continued building new advertisements with YPPI's photos into 2013, after this litigation began. She also testified that YPG transferred YPPI's photos to third parties, such as when YPG aided a third-party company in creating and publishing video ads for one of Ziplocal's customers, to be used in one of Ziplocal's publications. She stated that when YPG helped create these ads, it did not follow any specific measures to regulate what photos it was taking from Ziplocal's customer folders, nor did it provide third party companies with any parameters regarding how the photos could be used. The evidence showed that YPG only began swapping out YPPI's photos from ads after it was caught using the photos without a license. YPG's Director of Legal Affairs, Treena Cooper, also testified that YPG did not conduct any due diligence to determine whether it had a right to use the photos received from Ziplocal, and in fact YPG had "no idea" who owned the photos. [Doc. 426 at 151.] Ms. Cooper testified that "it wasn't a concern" of YPG what the source of the images it was receiving from Ziplocal was. [*Id.*] YPG's Vice President of Business Solutions, Gregory Shearer, also testified that YPG had no knowledge of any license agreement between Ziplocal and YPPI "because frankly it wouldn't have

made any difference to us." [*Id.* at 175–81.] YPG argues that willfulness is negated because outsourcing is common in the industry, so YPG had no reason to know that performing outsourcing work using photos received from Ziplocal would infringe the copyrights of others. YPG further argues that there was no evidence YPG knew of the license agreement between Ziplocal and YPPI, and YPG's outsourcing agreement with Ziplocal stated that the work performed would not infringe on any copyrights. However, according to YPG's own witnesses, YPG was not only fully aware that permission is required to use copyrighted photos, but it would not have made any difference whether YPG knew about Ziplocal's license from YPPI or not, because YPG was not at all concerned about the source of the photos it was receiving from Ziplocal. This evidence is more than sufficient to support a finding of willful copyright infringement under the Copyright Act.

In sum, we reject YPG's challenge to the sufficiency of the evidence to support a verdict that it infringed YPPI's copyrights. Accordingly, we affirm the district court's denial of YPG's renewed motion for a judgment as a matter of law.

**B.**

We turn now to YPPI's cross appeal, in which it contends that it is entitled to a new trial on damages due to alleged error in several of the district court's rulings: the court's denial of YPPI's request during discovery to issue letters rogatory to Canadian authorities to depose a Canadian affiliate of YPG; its refusal

31

to allow YPPI to admit evidence at trial of the Canadian affiliate's alleged use of YPPI's photos; its decision that each of YPPI's 178 collections of photos, rather than each of YPPI's 10,411 individual photos, is a "work" for purposes of computing statutory damages under the Copyright Act; and its denial of YPPI's request that it alter the jury's statutory damages award against Ziplocal after trial. For the following reasons, YPPI's arguments lack merit and thus do not warrant a new trial on damages.

## 1.

Letters rogatory are the means by which a court in one country requests a court of another country to assist in the production of evidence located in the foreign country. *See United States v. El-Mezain*, 664 F.3d 467, 516–17 (5th Cir. 2011). Federal courts have authority to issue letters rogatory in civil and criminal cases. *See United States v. Staples*, 256 F.2d 290, 292 (9th Cir. 1958); *United States v. Steele,* 685 F.2d 793, 809 (3d Cir. 1982). For example, Rule 28 of the Federal Rules of Civil Procedure allows for depositions to be taken in foreign countries. Fed. R. Civ. P. 28(b) provides that a letter of request ("whether or not captioned a 'letter rogatory'") may be issued: 1) "on appropriate terms after an application and notice of it;" and 2) "without a showing that taking the deposition in another manner is impracticable or inconvenient." Fed. R. Civ. P. 28(b)(1)–(2).

The Supreme Court has described the letters rogatory process as "complicated, dilatory, and expensive." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 531, 107 S. Ct. 2542, 2549 (1987). The decision whether to issue letters rogatory lies within the discretion of the district court and is reviewed for an abuse of that discretion. *El-Mazain*, 664 F.3d at 517 (citing *United States v. Liner*, 435 F.3d 920, 924 (8th Cir. 2006)). Several other circuits have held that there must be "good reason" to deny the request for the issuance of letters rogatory, at least when the request is made pursuant to Fed. R. Civ. P. 28(b). *See Complaint of Bankers Trust Co.*, 752 F.2d 874, 890 (3rd Cir. 1984) ("Although we do not dispute that it may be proper to refuse the issuance of a commission or letters rogatory, there are cases in which courts have indicated that there must be some 'good reason' justifying the denial of this particular type of judicial assistance.") (citing *Zassenhaus v. Evening Star Newspaper Co.*, 404 F.2d 1361, 1364 (D.C. Cir. 1968)).[5] Nonetheless, when a request to issue letters rogatory is overly broad or unlikely to lead to the discovery of relevant evidence, district courts retain discretion to refuse to issue them. *See*

---

[5] The "good reason to deny" standard originates from the 1963 amendments to Fed. R. Civ. P. 28(b). Prior to 1963, Rule 28(b) read in part, "A commission or letters rogatory shall be issued only when necessary and convenient, on application and notice, and on such terms and with such directions as are just and appropriate." The 1963 amendment deleted the words "only when necessary and convenient" from that sentence. *See* 8A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2083 (3d ed. 2014) (stating that "[a]lthough this change was not explained in the Committee Note, it seems clear that the discretion the courts formerly had in deciding whether to issue a commission or letters rogatory has been considerably reduced").

33

*e.g.*, *El- Mezain*, 664 F.3d at 518 (holding that the district court did not abuse its discretion in refusing to issue letters rogatory to Israeli authorities to review approximately 2,000 boxes of material to search for exculpatory evidence because the hope that the evidence would reveal favorable evidence was merely speculative and the request was thus a "fishing expedition"); *United States v. Rosen*, 240 F.R.D. 204, 215 (E.D. Va. 2007) (factors counseling against issuance of the letters rogatory were that the proffered testimony was not exculpatory and was cumulative of testimony from other witnesses available in the United States, the inherent delay in the letters rogatory process, and the fact that the testimony was not necessary to ensure a fair trial).

Over a year into discovery, YPPI asked the district court to issue letters rogatory to the appropriate Canadian authorities to depose Yellow Pages Group Corp. (hereinafter "YPG Canada"), a Canadian affiliate of YPG that also publishes phone directories. YPPI's motion, filed pursuant to Fed. R. Civ. P. 28(b), sought to depose a YPG Canada designee on all of the sources of its photos used in all of its phone directories, on all of the company's salespeople and graphic artists, and on all third parties used by the company for advertisement production. It also sought a corporate designee on the relationship of YPG Canada with three other non-parties: Canpages, Inc., a company that YPG Canada had acquired in 2010 and that was also a licensee of YPPI's, Volt Information Sciences, Inc., also a licensee of

YPPI's, and YPG Directories, LLC. The associated document requests sought all agreements between YPG Canada and other third parties such as Canpages, and copies of all Canpages phone directories, regardless of whether they contained YPPI's photos. YPPI sought this nearly unfettered access to YPG Canada because it argued that YPG builds ads for not only Ziplocal but also YPG Canada, and YPPI's photos were showing up in YPG Canada's publications, such as in videos located on YPG Canada's website. Since YPG Canada was not one of YPPI's licensees, YPPI believed that YPG was illegally transferring YPPI's photos to YPG Canada for use in its ads. YPG and Ziplocal opposed the request, arguing that it was overbroad and irrelevant because it amounted to YPPI's attempt to discover infringement activities on the part of YPG Canada, who was not sued or otherwise mentioned in any of YPPI's complaints. The district court refused to issue letters rogatory to the Canadian authorities, finding that any information that YPPI needed could be gathered within the confines of the United States.

YPPI now argues that the district court's denial of its motion to issue letters rogatory to depose YPG Canada prejudiced it to the extent that a new trial on damages is warranted. YPPI believes that had it been able to depose YPG Canada, it would have discovered that YPG or Ziplocal had transferred some of YPPI's photos to YPG Canada for its use, and if it had been able to present evidence to the jury that YPG or Ziplocal had allowed the use of YPPI's photos by another party,

that it would have undermined YPG and Ziplocal's defense at trial that there was no "real" damage in this case because Ziplocal merely transferred YPPI's photos to YPG for use in Ziplocal's phone directories and for no other purpose.

The issuance of letters rogatory is a discovery issue, and a party is not entitled to a new trial for an alleged discovery violation unless it shows that the denial of access to evidence was prejudicial to its substantial rights. *El-Mezain*, 664 F.3d at 517. This requires a showing of "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quotation marks omitted). "[A] reasonable probability is shown where the nondisclosure could reasonably be taken to put the whole case in such a different light as to undermine confidence in the jury verdict." *Id.* (quotation marks omitted). Here, YPPI was not prejudiced by its inability to conduct discovery from YPG Canada. After YPPI's motion was denied, the discovery it took from YPG confirmed that YPG had not transferred any of YPPI's photos to YPG Canada, and that YPG Canada had not used YPG to make the video ads in question. YPG's corporate designee, Ms. Meloy, testified that data was not transferred from YPG to YPG Canada and that YPG Canada built its own video ads without the help of YPG, either by using its own production team or by utilizing outside vendors. She stated that she had no knowledge as to the source of the photos that were appearing in YPG Canada's ads. Indeed, millions of pages of

documents were produced by YPG in this case, none of which evidenced such a transfer of photos to YPG Canada. We therefore cannot say that the evidence sought would have "cast the case in a different light, thereby undermining confidence in the verdict." *Id.* at 518. Accordingly, the district court did not abuse its discretion in failing to issue letters rogatory to the Canadian authorities to depose YPG Canada.[6]

## 2.

YPPI's second argument on cross appeal is that the district court should have allowed it to present at trial Moore's testimony that photos appearing on YPG Canada's website could be from YPG. We review a district court's evidentiary rulings for an abuse of discretion. *Burchfield v. CSX Transp. Inc*., 636 F.3d 1330, 1333 (11th Cir. 2001). We will only overturn an evidentiary ruling if the moving party establishes a substantial prejudicial effect. *Id*. A prejudicial effect is demonstrated when the moving party shows that the error "probably had a substantial influence on the jury's verdict." *Id.* (quotation marks omitted).

Prior to trial, YPG asked the district court to preclude YPPI from introducing any evidence at trial of the use of YPPI's photos by YPG Canada.

---

[6] We note that we reach the same conclusion even if the breadth of the district court's discretion in this matter is circumscribed by the "good reason to deny" standard as pronounced by several other courts of appeal. *See Complaint of Bankers Trust Co.*, 752 F.2d at 889–90, *Zassenhaus*, 404 F.2d at 1364.

YPPI had listed several print and online video ads that were published by YPG Canada on its exhibit list. YPG pointed out that Ms. Meloy, its corporate designee, had denied at deposition that any of the ads or videos were prepared by YPG or that YPG Canada obtained YPPI's photos from YPG, and that YPPI had no other evidence that YPG Canada obtained any of its photos from YPG. During trial, the court allowed YPPI to make a proffer regarding the evidence it sought to admit. During the proffer, Moore identified a series of ads published by YPG Canada that contained YPPI's photos. Moore testified that it was his belief that the YPPI photos appearing on YPG Canada's website could have been transferred to YPG Canada from YPG. However, he admitted that he had no direct knowledge of YPG's transfer of photos to outside parties. He also admitted that the photos could have come from other sources, such as Canpages, a company acquired by YPG Canada that had also licensed photos from YPPI. The district court excluded Moore's testimony, stating that it was too speculative to be considered by the jury.

YPPI now argues that it was prejudiced by the district court's exclusion of this evidence because a centerpiece of YPG and Ziplocal's defense was the lack of evidence that YPPI's photos were used for anything other than Ziplocal products. YPPI believes that had the jury been made aware of the further redistribution of the photos to YPG Canada, and the use of the photos in YPG Canada's ads, it would have awarded a higher damages amount.

38

The district court did not abuse its discretion in excluding the evidence. Moore's testimony was pure speculation, and thus too attenuated to be relevant. *See R.M.R. ex rel. P.A.L. v. Muscogee Cty. Sch. Dist.*, 165 F.3d 812, 817 n.9 (11th Cir. 1999) ("Abuse of discretion is the proper standard when reviewing a district court's decision to exclude evidence as irrelevant under Federal Rule of Evidence 401."). Despite conducting discovery for two years, YPPI uncovered no evidence that YPG transferred YPPI's photos to YPG Canada. To the contrary, Ms. Meloy's testimony was that YPG had not made any such transfers. As such, the jury would have had to reach the opposite conclusion based solely on Moore's conjecture. Moore's speculation had no probative value and as such would have been substantially outweighed by the unfair prejudicial impact to YPG. *See* Fed. R. Evid. 403 (even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence"). Further, YPG Canada was not a party in the action. In YPG Canada's absence, the jury could easily have confused YPG with YPG Canada, and tagged YPG with alleged extraterritorial infringement by YPG Canada. *See United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007) (stating that "[d]istrict courts are well within their discretion to exclude even relevant evidence" for the reasons enumerated in Fed. R. Evid. 403).

**3.**

YPPI's third argument is that the district court erred in ruling that each of its 178 collections of photos organized by heading name, rather than each of its 10,411 individual photos, was a "work" for the purpose of computing statutory damages under § 504(c)(1) of the Copyright Act. Section 504(c)(1) allows for statutory damages based on each "work" infringed. *See* 17 U.S.C. § 504(c)(1) (providing that "the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work"). That section then immediately states that "all the parts of a compilation . . . constitute one work." *Id.* § 504(c)(1). The Copyright Act defines a "compilation" as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." *Id.* § 101. The term "compilation" includes "collective works," which are defined as works "such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." *Id.* By taking the position that its 10,411 individual photos are each separate works, YPPI presumably seeks to raise the statutory damages award in this case from $123,000 to a minimum of $1.5 million and a potential maximum

40

of $300 million. *See id.* § 504(c)(1)–(2) (providing for a range of statutory damages between $750 and $30,000 for each infringed work and authorizing a court to increase the award of statutory damages to a maximum of $150,000 per infringed work in cases of willful infringement).

This Court has not previously determined the standard by which it reviews a district court's determination of what constitutes a work for statutory damages purposes under the Copyright Act. At least one other circuit has concluded that the review is *de novo*. *See Bryant v. Media Right Prod., Inc.*, 603 F.3d 135, 140 (2d Cir. 2010) (holding that the "question of whether a work constitutes a 'compilation' for the purposes of statutory damages . . . is a mixed question of law and fact" and therefore reviewed "*de novo*") (citing *Gamma Audio & Video, Inc. v. Ean–Chea*, 11 F.3d 1106, 1116 (1st Cir. 1993)). We hold that this issue is a mixed question of law and fact, and we review the district court's application of the law to the facts *de novo*.

In deciding that each of YPPI's 178 collections was the relevant work, the district court found that each collection was a "compilation" of photos under 17 U.S.C. §§ 504(c)(1) and 101. The factual record supports that conclusion. First, Moore's own testimony supports the collective nature and purpose of YPPI's photos organized by subject matter heading. Moore testified that the entire purpose of grouping his photo collections by subject matter—rather than marketing

41

individual photos—was customer appeal and efficiency. He stated that YPPI's customers were publishers of phone directories, and their artists liked being able to search for photos to include in ads by specific subject matter. Indeed, to make his photos relevant and marketable, Moore spent "a lot of years" working with customers "to determine what headings generate revenue and what headings generate usage." [Doc. 423 at 67–68.] Once Moore selected a heading, he would develop the photo collections around it. Using a "Food" heading for an example, Moore testified that, once the heading was selected, the next step was to have the photographer produce the associated photo collection. [*Id*. at 68.] In other words, the heading drove the collection of the photos, not the other way around. In every sense, then, each of Moore's 178 headings is compilation as defined in the Act because each is a collection of photos that Moore and YPPI "selected, coordinated, or arranged" in a way that results in "an original work of authorship." *See* 17 U.S.C. § 101.

The manner in which Moore registered his photos with the Copyright Office—as collections rather than as individual photos—also supports the conclusion that the 178 headings, and not the 10,411 individual photos, are the "works" in this case. Although the manner of copyright registration is not dispositive of the works issue, this Court has previously considered it to be at least a relevant factor. *See MCA Television Ltd. v. Feltner*, 89 F.3d 766, 769 (11th Cir.

42

1996). As Moore put it, customers "bought collections. And I registered my images the same way. . . . you get images. You register them in a group. And so they wanted the relevance of having multiple images." [Doc. 424 at 265–66.] Moore registered each of his 178 photo collections with the Copyright Office under their heading titles, grouping various title collections together on 44 registration applications. As noted on the registrations, each collection of photos was taken by the same photographer, shared the same subject matter, and was published on the same date. For example, one such copyright registration lists 50 photos for "Golf"-related ads, all taken by "Trent Moore," and all published together on "1-Mar-2001." Another lists 66 photos for "Auto Repair and Crashes"-related ads, all taken by "Richard Lawless," and all published together on "02/03/2009." The photos in each group share a title, e.g., "Golf" or "Auto Repair and Crashes 3." Where the registration form called for a "Title of This Work," YPPI listed the heading names for the photos covered, not individual photos.

Not only did Moore create, market, and register his photos as collections organized by subject matter heading, he almost exclusively distributed them as collections to his customers, on hard drives, CDs or DVDs, or through a web-portal, always organized by heading so that they were searchable "by key word, category, or collection name." [Doc. 423 at 76–78.] Further, YPPI's SLPA with Ziplocal provided that YPPI "will ship 1–2 headings per month" and contemplated

43

that Ziplocal would "purchase all current titles as well as all new relevant headings as they become available, up to the first 200 headings." [Joint Trial Exhibit 2.]

Finally, we find telling that YPPI's own complaints described each of the 178 collections as a "Work[]." Each complaint alleged that YPPI "created and produced a series of photographic images as follows," which was followed by a list of each collection of photos by heading name, and then alleged that each "series of images is collectively referred to in this Complaint as the 'Works.'" [*See* Complaint, doc. 1 at ¶ 17; First Amended Complaint, doc. 39-1 at ¶ 17; Second Amended Complaint, doc. 56 at ¶ 18; Third Amended Complaint, doc. 248 at ¶ 15.] Because YPPI chose to create, market, deliver, register, and describe the photos as collections, not as individual photos, this Court is convinced that infringement of each collection should result in only one statutory damage award.[7]

We are not persuaded, as YPPI argues, that this Court's previous opinion in *MCA Television Ltd. v. Feltner*, *supra*, should change our conclusion. In *Feltner*,

_____

[7] We reject YPG's argument that YPPI should not prevail on this claim because YPPI invited the district court's error in its works determination by arguing in the alternative that each of its 178 collections constituted a work. YPPI's primary argument to the district court was always that each of its 10,411 photos was as separate work, but it also posited as a secondary "fallback" position that if the district court rejected that argument, that it should find that each of its 178 collections is a work, rather than find that each of its 44 copyright registrations is a work or that the entire library of photos is one work, as argued by Ziplocal. Offering such a "fallback" position in mere response to an issue raised by the opposing party does not equate to inviting the district court's error so as to waive review of the issue on appeal. *Cf. United States v. Frank*, 599 F.3d 1221, 1240 (11th Cir. 2010) (the doctrine of invited error applies when a defendant affirmatively requests or stipulates to a particular point, which is then adopted by the court).

this Court agreed with other circuits that have held that each episode of a syndicated television series was a separate work and not part of a compilation because each had "independent economic value and is, in itself, viable." 89 F.3d at 769 (citing *Gamma*, 11 F.3d at 1116; *Robert Stigwood Grp., Ltd. v. O'Reilly*, 530 F.2d 1096, 1105 (2d Cir. 1976); *Walt Disney Co. v. Powell*, 897 F.2d 565, 569 (D.C. Cir. 1990)). In support, the Court noted that regardless of "the decision of a distributor of television programs to sell television series as a block, rather than as individual shows," each episode was "produced independently from the other episodes," was "aired independently from preceding and subsequent episodes," and was "individually copyrighted" by the owner. *Id*. The Court rejected the argument that the episodes were part of an anthology, and thus the entire series was one collective work subject to only one award, because each episode had an individual plot, and it was not necessary to view the episodes in chronological order. *Id.* at 769–70. In reaching that conclusion, the Court relied upon *Twin Peaks Productions, Inc. v. Publications, International, Ltd.*, 996 F.2d 1366, 1381 (2d Cir. 1993), where the Second Circuit had reached the same result with respect to each episode of a television series even though each succeeding episode continued a single plot line. *Id.* at 770.[8]

---

[8] At least three other circuits have adopted the "independent economic value" test as articulated by this Court in *Feltner*. See *Gamma*, 11 F.3d at 1116–17 (applying what that court described as a "functional" test to hold that each episode of a television show, although released

Although this Court held that the particular television episodes in *Feltner* were separate works because they could each "live their own copyright life," 89 F.3d at 769, we certainly do not read the *Feltner* decision as foreclosing the application of 17 U.S.C. § 504(c)(1)'s directive that "all parts of a compilation . . . constitute one work" for all cases. Instead, this Court in *Feltner* evaluated real world conditions related to how the episodes were created, produced, aired, and registered with the Copyright Office, to find that each episode had an economic value independent from the other episodes, and thus were not part of a compilation or collective work. 89 F.3d at 769. An application of the same factors considered in

on videotape as part of a complete series, could be the subject of a separate statutory damage award because each episode could be rented and viewed separately and each was separately produced); *Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*, 106 F.3d 284, 295 (9th Cir. 1997) (same), *rev'd on other grounds sub nom. Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 118 S. Ct. 1279 (1998)); *Walt Disney Co.*, 897 F.2d at 569 (opining that "separate copyrights are not distinct works unless they can 'live their own copyright life'" in reaching the conclusion that the copyright owner could not receive a separate statutory damage award for each separate picture of Mickey Mouse and Minnie Mouse in different poses, because each picture did not have independent economic value) (quoting *Stigwood*, 530 F.2d at 1015). However, the United States Court of Appeals for the Second Circuit declined to adopt the independent economic value test to an album of songs in *Bryant v. Media Right Productions, Inc.*, 603 F.3d at 140–42, stating, "The [Copyright] Act specifically states that all parts of a compilation must be treated as one work for the purpose of calculating statutory damages. This language provides no exception for a part of a compilation that has independent economic value, and the Court will not create such an exception." *Id.* at 142. The Second Circuit distinguished its prior decision in *Stigwood*, 530 F.2d at 1105, where it had "held that each separately copyrighted song from the musical *Jesus Christ Superstar* could be the subject of a separate statutory award because each song could 'live [its] own copyright life.'" *Bryant*, 603 F.3d at 142 n. 7 (quoting *Stigwood*, 530 F.2d at 1104–05) (alteration in original). The Second Circuit explained that, in *Stigwood*, it had been "awarding statutory damages pursuant to the Copyright Act of 1909, which provided for a separate statutory damage award 'for each infringement that was separate,'" and not under the Copyright Act of 1976, in which "[t]he one-award restriction for compilations was introduced." *Id.*

46

*Feltner* to YPPI's photos supports our conclusion that each of YPPI's 10,411 individual photos does not have independent economic value for statutory damages purposes. As described more fully above, Moore created his photos for the sole purpose of being organized into collections based on the subject matter of the photos, e.g., "Golf," "Roofing," "Plumbers," and he marketed them as such for easy searchability by phone book publishing customers. In other words, the photos' usefulness and economic value is derived from their collective nature, not their individuality. The *Feltner* court also considered that the television episodes were registered individually, unlike here, where they were registered as collections under their heading name, and grouped together on 44 registration applications. YPPI argues that because group registration is permitted under regulations promulgated by the Copyright Office, *see* 37 C.F.R. § 202.3, the fact that Moore registered his photos in groups should not indicate that the photos are a compilation under 17 U.S.C. § 504(c)(1). *See Gamma Audio*, 11 F.3d at 1117 (holding that registering copyrights as multiple works on a single registration form does not preclude the owner from collecting an award of statutory damages for the infringement of each individual work). However, 37 C.F.R. § 202.3(b)(10), covering "[g]roup registration of published photographs," provides that to be eligible for group registration, the "same person" must have taken all of the photos, *see id.* § 202.3(b)(10)(ii), and the photos must have been published in similar

47

circumstances, i.e. "within the same calendar year," and if "published on the same date" the common date of publication "must be identified," *see id.* § 202.3(b)(10)(iii)–(iv). If anything, these requirements reinforce the conclusion that the headings and photos associated with them are collective works.

We act consistently with *Feltner* in finding that, under the independent economic value test, Moore's 10,411 individual photos equate to 178 compilations and 178 works under 17 U.S.C. § 504(c)(1). We note that numerous district courts have applied the independent economic value test to find that groups of photos should be collectively treated as compilations under § 504(c)(1) of the Copyright Act and thus a single work for statutory damages purposes. *See Greenberg v. Nat'l Geographic Soc'y*, No. 97–3924–CIV, 2003 WL 25841579, at *3, *5–6 (S.D. Fla. Feb. 18, 2003) (applying the independent economic value test to the plaintiff's 64 photos to find that they only represented four works for statutory damages purposes because they had been compiled into four *National Geographic* articles and registered by the plaintiff in the Copyright Office as belonging to those four "collective works"); *Tang v. Putruss*, 521 F. Supp. 2d 600, 609–10 (E.D. Mich. 2007) (although noting that the Sixth Circuit had not indicated what analysis courts are to use in determining whether a group of photos constitutes a single work, applying the independent economic value test to find that a series of photos of models wearing a line of dresses taken at a single session, by a single

48

photographer, for a single purpose, i.e. to advertise the clothing line, was a single work); *Coogan v. Avnet, Inc.*, No. CV040621PHXSRB, 2005 WL 2789311, at *5–6 (D. Ariz. Oct. 24, 2005) (applying the independent economic value test to find that a series of photos taken of a company's CEO at a single session, by a single photographer, for a single purpose, and subject to a single license agreement, was one work). One exception, upon which YPPI heavily relies, is *Playboy Enterprises, Inc. v. Sanfilippo*, No. 97-0670-IEG (LSP), 1998 WL 207856 (S.D. Cal. Mar. 24, 1998), where the district court applied the independent economic value test to find that each of 7,475 separate copyrighted photos at issue were separate works for statutory damages purposes. *Id.* at *5. There, the infringer copied thousands of copyrighted photos from Playboy, which he offered for sale via a website. *Id.* at *1. When Playboy sought statutory damages for each of the photos copied, the infringer attempted to argue that since the photos were collectively displayed in only 27 of Playboy's copyrighted magazines, each magazine constituted a singular violation, but not each photo. *Id.* at *5. In awarding statutory damages for each of the 7,475 photos, the court found:

> [A]lthough each of these images may have appeared in a singular issue of one of plaintiff's copyrighted publications, these images are subject to re-use and redistribution in accordance with various licensing arrangements. Furthermore, each image represents a singular and copyrightable effort concerning a particular model, photographer, and location. The fact that many of these images appeared together should not detract from the protection afforded to each individual effort. Furthermore, defendant marketed each one of these images

separately. Based on these circumstances, the Court finds it appropriate to award statutory damages for each separate image under § 504(c)(1).

*Id.*

Unlike the photos in *Playboy* that were copyrighted and marketed individually, Moore's photos were always registered and marketed as collections. YPPI's collections of photos are more like the series of photos in *Greenberg*, *Tang*, and *Coogan*, which were taken of one subject, by one photographer, at a single session. Indeed, YPPI's retrospective attempts to highlight the singular aspects of its photos are not persuasive. It argues that the photos were taken by four different photographers: Trent Moore, Richard Lawless, Richard Suggs, and Heather Rossick, and consist of multiple objects and models in multiple settings. However, while YPPI used four different photographers to create its entire library over the years, for each individual collection organized by subject matter that is at issue in this lawsuit, only a single photographer was ever used, as confirmed in YPPI's copyright registrations. Further, Moore testified that he took most of the photos and personally edited each one. Additionally, while, for instance, all of the 50 to 100 photos categorized and sold under the heading of "Roofers" may depict different models and settings, each photo obviously is relevant to inclusion in ads about the roofing industry and was marketed and sold for that purpose.

50

YPPI also points to some instances where it sold its photos individually, but the record reveals that such instances are outliers.[9] In any event, if the dispositive factor for whether a work has an independent economic value is whether it can conceivably be sold on its own, Congress's express mandate in 17 U.S.C. § 504(c)(1) that "all parts of a compilation [are to] constitute one work" would be rendered meaningless, as the very definition of a collective work in the Copyright Act—"a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole," *see id.* § 101—presupposes that each individual work in the collection has independent value. For this reason, we believe that the independent economic value test does not begin and end with an inquiry into whether a separate unit in a multi-work project could possibly have some independent economic value if sold separately.

We are also not persuaded by YPPI's insistence that the photos compiled under a heading only become useful when a customer selects a particular photo to build an ad. To the contrary, Moore testified about the collective usefulness of the headings: they allowed the customer to search by subject matter relevant to their business, and the multiple photos under that heading gave the customer flexibility

---

[9] For instance, Moore testified that "there was a guy in Louisiana who loved his advertising so much he called the company and wanted an image for other stuff. So yeah, I've sold by image." [Doc. 423 at 114–15.]

51

to choose between different "looks" for the same subject. According to Moore, the very idea at the heart of his business was to provide customers with an integrated collection of photos, whose chief value came from being "heading specific" and sharing the "same vernacular." [Doc. 423 at 66.] Neither the fact that YPPI would sometimes offer per-photo prices rather than per-collection prices to customers,[10] nor that its photos were eventually used individually to create separate advertisements, diminishes the importance of the fact that YPPI's entire business strategy was to distribute and publish the photos collectively, so that customers could access and search them collectively. Courts applying the independent economic value test have considered the way the owner marketed his work product as relevant to the determination of the number of works at issue, and we think rightly so. *See Coogan*, 2005 WL 2789311, at *5 ("Unlike the photographs at issue in *Playboy*, there is no evidence in the record that Plaintiff marketed the images to the public separately."); *Playboy*, 1998 WL 207856, at *5 ("Furthermore, the defendant marketed each one of these images separately.").[11]

---

[10] While YPPI would occasionally offer per-image prices to customers, virtually all of those customers would buy access to the entire inventory of photos collections, on a collective basis via YPPI's web portal, before selecting various groups of images to download. [Doc. 423 at 115–25.]

[11] We acknowledge that the Court in *Feltner* assigned little relevance to how the distributor of the television programs chose to sell the series, i.e., as a block rather than as individual shows, in its determination that each episode could stand alone. 89 F.3d at 769. However, at issue in *Feltner* were episodes with individual plot lines that were produced, aired, and copyrighted separately, evidence of their independent value despite the fact that it was

52

Finally, YPPI's argument that this Court should disregard the way it described its 178 collections of photos in its complaints is not well taken. YPPI's description of its 178 collections as "Works" is an admission by a party, akin to witness testimony or any other evidence the district court could have used in determining the works issue.[12]

In sum, because YPPI created, marketed, published, registered, and repeatedly described its photos as 178 collections under 178 headings organized by subject matter, we affirm the district court's decision to treat each collection as a compilation, subject to only one award of statutory damages.

**4.**

YPPI's final argument on cross appeal does not involve YPG. YPPI argues that the district court erred when it refused to address an apparent inconsistency between the jury awarding $123,000 in statutory damages against YPG and nothing in statutory damages against Ziplocal. YPPI argues that the jury's statutory damages award against Ziplocal of zero dollars should be at least $750 for each

---

customary in the industry to sell episodes as a block series. We don't think *Feltner*'s reasoning suggests that we must simply ignore the overwhelming evidence in this case that Moore's photos were marketed as collections.

[12] After YPG began arguing that each of YPPI's 10,411 photographs could not be considered a work, YPPI amended its complaint to allege for the first time that its photos were "distributed both individually and in collections," citing as the reason for the amendment the discovery of additional facts in discovery. [*See* Third Amended Complaint, Doc. 248 at ¶ 15.] The district court properly noted that this was a significant change in YPPI's legal theory as to what constituted a work, which was wholly unrelated to the discovery of additional facts.

work it found Ziplocal directly infringed, which would total $92,250 for 123 infringed works.[13] As a result, YPPI asserts that this Court should reverse and remand for the district court to conduct a trial on the issue of damages alone. [Reply Brief of YPPI at 29.]

A prevailing plaintiff may not recover both actual and statutory damages under the Copyright Act: statutory damages recovery is "instead of actual damages and profits." 17 U.S.C. § 504(c)(1). "[I]f a party so demands, a jury must determine the actual amount of statutory damages under § 504(c) in order 'to preserve the substance of the common-law right of trial by jury.'" *Feltner*, 523 U.S. at 355, 118 S. Ct. at 1288 (quoting *Tull v. United States*, 481 U.S. 412, 426, 107 S. Ct. 1831, 1841 (1987)) (internal quotation marks omitted). The plaintiff may make its election between actual and statutory damages "'at any time before final judgment is rendered.'" *Jordan v. Time, Inc.*, 111 F.3d 102, 104 (11th Cir. 1997) (quoting 17 U.S.C. § 504(c)). Ordinarily, when the issue of damages in this type of case is tried to a jury, and the plaintiff is successful in making out its claim, the plaintiff would simply choose between the actual or statutory damages as determined by the jury. This, however, was no ordinary case.

---

[13] We note that Ziplocal never filed a brief in response to YPPI's argument, but this fact alone does not warrant reversal, as YPPI argues. The only sanction authorized by the federal rules for an appellee's failure to file a response brief is the refusal to hear the nonfiling appellee at oral argument. *See* Fed. R. App. P. 31(c) (an appellee who failed to file a brief will not be heard at oral argument, except by permission of the Court).

Despite 17 U.S.C. § 504(c)(1)'s instruction that statutory damages must be awarded "in a sum of not less than $750" for each work infringed, the jury awarded zero dollars in statutory damages for Ziplocal's willful direct infringement of 123 of YPPI's copyrighted works. The jury awarded YPPI only one dollar in actual damages against Ziplocal on the direct infringement claim. Clearly, YPPI was not happy with having to choose between nothing on one hand and one dollar on the other hand, so it requested that the district court address the jury's inconsistent statutory awards. Although YPPI is correct that a court may in appropriate instances correct a jury's damages verdict when it falls below the minimum amount required by law, *see U.S. E.E.O.C. v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1252–53 (11th Cir. 1997), principles of invited error require YPPI to now be bound by the jury's statutory damages award and bar us from reviewing YPPI's claim on appeal. *See United States v. Ross*, 131 F.3d 970, 988 (11th Cir. 1997) ("It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party.") (quotation marks omitted). The doctrine of invited error "stems from the common sense view that where a party invites the trial court to commit error, he cannot later cry foul on appeal." *United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009).

55

Here, YPPI elected to present both actual and statutory damages theories to the jury, so it could then choose the higher award. Indeed, the court chose to read YPPI's proposed jury instructions to the jury, stating:

> Now, plaintiff may recover actual or statutory damages. And I'll define those terms now for you. Plaintiff is entitled to recover any actual damages suffered because of the infringement. Actual damages means the amount of money adequate to compensate plaintiff for the injury to the market value of the copyrighted work caused by the infringement. . . . Now, plaintiff also seeks a statutory damage award. Statutory damages are damages that are established by the Congress in the Copyright Act. The purposes are to compensate the copyright owner, penalize the infringer and deter future copyright law violations. The amount awarded must be between $750 and $30,000 for each copyrighted work that you find to be infringed unless one of the exceptions applies and I'll explain later.

[Doc. 429 at 107–08.] This wording follows the Eleventh Circuit Pattern Jury Instructions as well as the rule that YPPI was entitled to either actual or statutory damages, but not both. *See* Eleventh Circuit Civil Pattern Jury Instructions, No. 9.30 (2013); 17 U.S.C. § 504(c)(1). The district court also chose the verdict form drafted and submitted by YPPI. The verdict form asked in Question No. 4 whether the jury found by a preponderance of the evidence that Ziplocal had infringed any of YPPI's copyrights. [Doc. 422.] The jury placed an "x" in the blank for "Yes." On the same page of the verdict form, Question No. 6, the question on damages against Ziplocal, provided:

> If you answered "Yes" to No. 4, that Plaintiff Yellow Pages Photos, Inc. should be awarded:

56

$_____ in actual damages *__or__*
$_____ in statutory damages.

[Doc. 422 (emphasis added).] The use of "or" between the two types of damages

could have led the jury to conclude either 1) that it should determine both actual

and statutory damages so that a decision could later be made by the plaintiff

between the two amounts (and this is certainly what the law requires), or 2) that it

should determine an amount for actual **or** statutory damages, but not both. The

problem is that the pattern jury instruction, as well as the verdict form, could have

been clearer on this point. The instruction could perhaps have been clarified by

telling the jury that if it finds infringement on the part of a defendant, then it is

required to determine an amount to award the plaintiff for both statutory damages

against that defendant in an amount no less than $750 for each work that it found

was infringed as well as an amount for actual damages. The jury could also have

been specifically told that one or the other would ultimately be awarded to the

plaintiff, but not both. Here, the jury ultimately completed the verdict form in

Question No. 6 and awarded YPPI actual damages (albeit one dollar) and no

statutory damages.

YPPI points out that immediately after the court instructed the jury and

explained the verdict form, its counsel requested that the court clarify for the jury

that, if the jury found infringement, it should put down an amount for both actual

and statutory damages, stating: "I'm not sure it was entirely clear to the jury that they should put an amount for actual and statutory damages—amount for statutory damages. If that happens, we think we'd like to have that clear for the jury." [Doc. 429 at 119.] Counsel for Ziplocal and YPG then objected, claiming: "It's their form. The form is clear. You've already read the instructions." [*Id.* at 119-120.] We note here that we do not find that YPPI's submission of the jury instructions and verdict form invited the error of which YPPI complains. First, YPPI's jury instruction and verdict form submission generally followed this Circuit's Pattern Instruction and accurately stated the law: under § 504(c), a copyright owner is entitled to an award of only actual damages or statutory damages, but not both. Second, YPPI specifically requested an additional instruction clarifying that the jury should find both statutory and actual damages, so YPPI could later elect. In part, the invited error doctrine serves to prevent a party from building error into the record and later capitalizing on that error. Here, that purpose is not served since YPPI's instruction and verdict form were not incorrect statements of the law, and, in any case, when the district court could still do something about it, YPPI attempted to correct that aspect of the problem that it now appeals.

Nevertheless, even assuming without deciding that the district court erred in declining to give further instructions to the jury, we decline to review the district court's decision not to adjust the statutory award for Ziplocal's direct infringement

58

to at least $750 for each work infringed because YPPI did invite error regarding that issue in another regard. More specifically, the jury submitted a question to the court during its deliberations, asking whether it could award "actual damages to one and statutory damages to the other?" [Doc. 430 at 4.] The court read this question as referring to "actual damages to one defendant and statutory damages to the other," referring to YPG and Ziplocal. [*Id.*] When the court inquired of YPPI's counsel what the answer to this question should be, YPPI's counsel at first noted that he believed that the jury was "supposed to put actual and statutory damages calculations in both blanks." [*Id.* at 5.] But upon reflection, YPPI's counsel decided that the jury could indeed award only statutory damages to one defendant and only actual damages to the other, meaning that YPPI agreed that the jury's statutory damages award could indeed be zero dollars as to one of the defendants. When asked what the answer should be to the jury's question, YPPI's counsel answered: "Yes. Okay. We would say yes, Your Honor. That's okay." [*Id.* at 6–7.] In agreeing that the jury could indeed award zero dollars in statutory damages against one or the other of the defendants, YPPI waived the argument that such an award was legal error.

This situation is similar to that in *United States v. Fulford*, 267 F.3d 1241 (11th Cir. 2001), where the defendant-appellant argued that the district court gave an erroneous supplemental instruction in response to a jury question during

59

deliberation. *Id.* at 1247. The trial court read the jury's question into the record and engaged in a lengthy colloquy with the parties. *Id.* At the end of the colloquy, the court read its proposed supplemental instruction, confirming with the parties that the instruction was acceptable to them before instructing the jury. *Id.* The defendant's attorney responded that the instruction was "acceptable to us." *Id.* When the defendant later attempted to overturn the verdict by arguing that the supplemental instruction was erroneous, the court held that it did not have to reach the question whether the instruction was plain error because the error was invited by the defendant. *Id.* at 1247. Similarly here, YPPI expressly agreed to the supplemental instruction by stating, "Yes. Okay. We would say yes, Your Honor. That's okay." [Doc. 430 at 6–7.] Having agreed to the proposed instruction in response to the jury's question, indicating that the jury could award zero dollars in statutory damages to one defendant, YPPI has waived its right to challenge that award on appeal.[14]

After the verdict was read, counsel for YPPI did assert that it was "inconsistent" for the jury to award zero dollars in statutory damages against

---

[14] The Court notes that here, the jury also found Ziplocal to be guilty of contributory copyright infringement and awarded YPPI $100,000 in actual damages and zero dollars in statutory damages against Ziplocal on that claim. After trial, YPPI elected to recover $100,001 in actual damages from Ziplocal, in lieu of statutory damages of zero dollars. Had YPPI made the same argument with regard to the statutory damages award on the contributory infringement claim, namely that that the jury's award of zero dollars in statutory damages on that claim was error, our ruling on invited error would also apply. However, nothing we say here affects YPPI's election of actual damages against Ziplocal on the contributory infringement claim.

Ziplocal. However, this was after the jury had already deliberated based, in part, on the agreement of all counsel, including YPPI's, that the jury should be told that it could indeed award no statutory damages to one or the other of the defendants. *See Fulton*, 267 F.3d at 1247 (rejecting the defendant's argument that his acceptance of the court's supplemental instruction did not render it invited error because, five hours later, his counsel requested an additional instruction based on subsequent research, because the subsequent attempt to submit an additional instruction "has no bearing on [the defendant's] earlier unconditional acceptance of the court's instruction"). In post-trial briefing, YPPI again asked the court to correct the jury's statutory damages award and to assess statutory damages against Ziplocal on YPPI's direct infringement claim "in no less than the statutory minimum amount of $750 per work infringed, for a total of no less than $92,250." The court declined, finding that YPPI had invited the error. Having submitted the determination of the amount of statutory damages to the jury and then having agreed that the district court should tell the jury that it could find that amount to be zero, YPPI cannot now complain that the jury returned a verdict finding that amount. YPPI was left to elect between the actual and statutory amounts determined by the jury.

## III.

We affirm the district court on all issues raised on appeal.

61

**AFFIRMED.**