[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-11476

_____

D.C. Docket No. 1:08-cr-00055-RWS-GGB-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

AMADOR CORTES-MEZA,
a.k.a. Amador Cortes Meza,
a.k.a. Javier,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 13, 2017)

Before ROSENBAUM, JULIE CARNES, and GILMAN,[*] Circuit Judges.

JULIE CARNES, Circuit Judge:

## BACKGROUND

In 2008, a federal grand jury returned a 34-count indictment charging defendant Amador Cortes-Meza and five co-defendants with various offenses related to human trafficking and forced prostitution. As the case progressed, all of his five co-defendants pled guilty to various indicted offenses, but Defendant chose to go to trial.

Over the course of a ten-day trial, nine female victims testified about Defendant's role in a years-long sex-trafficking and prostitution ring. The details of each victim's testimony varied depending on the individual's experience, but each young woman told a similar horrifying tale. While living in Mexico, each victim separately met one of the defendants and began dating or spending time with that defendant. Eventually, each woman was enticed to come to the United States—sometimes by threat, sometimes by a promise of work, and sometimes because of the victim's romantic interests in one of the defendants. The defendants arranged for the victims' illegal entry into the United States, and they were eventually brought to a number of houses around the greater Atlanta area.

---

[*] The Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

Once there, however, the victims were told that they were going to have to work as prostitutes for the defendants. Each victim worked for a specific defendant—referred to as the victim's "padrote"—and was picked up by a driver who transported the victim to various locations to perform sexual acts on customers. On an average night, each victim was required to service ten to thirty customers and to give all of the money she earned to the driver or to her padrote. A victim was given a predetermined number of condoms each night, and her padrote would determine how many clients she had serviced by counting the number of condoms left at the end of the night. In this way, the padrote could determine how much money the victim owed him. The defendants also made the women clean their vaginas with alcohol after each night's work.

During the course of the prostitution operation, the defendants used violence, threats of violence against the victims and their families, insults, psychological coercion, and strict oversight to force the women to remain in their designated houses and to work as prostitutes. Two victims, RHP and LMJ, faced particularly egregious situations.[1]

RHP met Defendant in Mexico and Defendant took her to a festival on a date. Rather than taking her back home that night, however, Defendant took RHP

---

[1] Based on his conduct toward these two victims, Defendant was charged with sex trafficking by force, fraud, or coercion, which carries a higher statutory minimum (15 years) than do the other criminal counts. The maximum penalty is life imprisonment.

3

to a hotel an hour from her home, refused to return her home, and had sex with her against her will. Defendant then took RHP to his house, which was a five-hour drive from where RHP lived. RHP believed that Defendant was going to marry her, but was soon disabused of that notion. Defendant prohibited RHP from leaving the house or using the phone outside of his presence, and began beating her with his belt and boot for disobeying his wishes. On one occasion, Defendant brought RHP to a party and saw her talking to someone else. When they returned home, Defendant stuck RHP's head in a water tank while punching her and yelling obscenities at her, and then threw a bucket full of water at her.

RHP did not want to go the United States, but Defendant beat her whenever she expressed that sentiment. After about three months, Defendant arranged for and paid for RHP to be brought to the United States. Defendant had told RHP that she would work at a restaurant in America, but after they arrived in the Atlanta area, Defendant told RHP that she would have to work as a prostitute. When RHP refused, Defendant beat her and threatened her with further beatings if she refused to comply. On her first night in Atlanta, RHP was sent out to work. Because she kept crying, her driver returned her home after only two customers. Defendant chastised her and told her that she would have to work harder than that in the future.

4

Over the course of the prostitution operation, the violence only intensified and RHP was beaten any time she said that she did not want to work as a prostitute. In one instance, RHP was pushed down the stairs when she expressed her opposition to this line of work. On another occasion, one of the other women at the house escaped and called RHP to tell her to run away as well. The next day, Defendant threw RHP to the floor, kicked her, and beat her with a broom stick until the broom stick broke. Defendant then grabbed a closet rod and continued to hit RHP with it. Defendant broke RHP's finger and caused her head to bleed, but he would not take her anywhere for treatment. RHP's sister was also brought to the United States by the co-defendants, but RHP was strictly forbidden to speak with her. If the two were ever seen talking, Defendant would beat RHP and a co-defendant would beat her sister. RHP felt "destroyed" living under Defendant's control.

LMJ had a similar experience. LMJ met Defendant in a park in Mexico and Defendant invited LMJ to a party the next day. LMJ accepted. On the way to the party, Defendant asked to borrow LMJ's cell phone, but never returned it to her. Then, rather than taking her to a party, Defendant instead took her to a hotel room six hours away from her home and forced LMJ to have sexual relations with him. LMJ had no phone or money and was scared of Defendant because he would scream at her and acted aggressively towards her.

Defendant then made arrangements for a coyote[2] to bring LMJ and Defendant into the United States, and became aggressive toward LMJ whenever she said that she did not want to go.  Once they made it to the Atlanta area, Defendant told LMJ that she would have to work as a prostitute to reimburse him for the coyote's charge.  LMJ had never been told that she would have to pay Defendant for the trip, and when she refused to prostitute herself, Defendant beat her and told her that it was "as if [she] was his property."  Defendant also threatened LMJ, telling her that if she tried to escape, he would kill her and her family in Mexico.  LMJ felt that she could not escape because she had to protect her family.

During the two and a half years that LMJ worked as a prostitute for Defendant, Defendant beat her, humiliated her, and insulted her—calling her a whore and a bitch.  Defendant hit LMJ if she did not bring home enough money in a given night and also beat her if she was insubordinate or seen talking or laughing with others.  One time, Defendant beat LMJ when her driver's car broke down and she was unable to service customers.  Another time, at a birthday party, Defendant hit her with a TV cord until her body and face were bruised and swollen.  On yet another occasion, Defendant wanted LMJ to play volleyball, but when she refused to play, Defendant took a closet rod and began hitting her with it.  He then threw

---

[2]  A "coyote" is a paid guide that helps individuals illegally cross the border from Mexico into the United States.

an iron at LMJ, hitting her in the head.  Her head bled from the injury for about two weeks but no one took her to the doctor because Defendant was scared that LMJ would tell the doctor that he had hit her.  The beatings humiliated LMJ, and the continuous insults and obscenities made her feel worthless.  On top of all this, Defendant also required LMJ to have sex with him.

In addition to this testimony, other victims corroborated the accounts of violence against RHP and LMJ and provided their own similar testimony about Defendant's violence and coercion.  Immigration and Customs Enforcement (ICE) Agents also testified at trial.  The lead case agent described how two different victims were rescued during arrests of two defendants and explained that these victims provided information about the prostitution operation and the remaining defendants.  Acting on this information and independent investigation, ICE agents executed search warrants on two different houses involved in the operation and arrested Defendant and the remaining co-defendants.

At trial, Defendant's primary theory of the case was that the women identified at trial had voluntarily engaged in prostitution and had not been forced to do so against their will.  Defendant did not disagree that these women had been brought to the United States by him or that the women were working as prostitutes.

After considering the evidence, the jury convicted the Defendant on all 19 counts brought against him:  five counts of bringing an alien into the United States

7

through a non-designated point of entry, in violation of 8 U.S.C.

§ 1324(a)(1)(A)(i); eight counts of importing and harboring an alien for purposes

of prostitution, in violation of 8 U.S.C. § 1328; one count of transporting a minor

for purposes of prostitution, in violation of 18 U.S.C. § 2423(a); two counts of sex

trafficking of a minor, in violation of 18 U.S.C. § 1591(a) & (b)(2); two counts of

sex trafficking by force, fraud, or coercion (as related to RHP and LMJ), in

violation of 18 U.S.C. § 1591(a) & (b)(1); and one count of conspiracy, in

violation of 18 U.S.C. § 371.  At sentencing, Defendant faced a sentence of life

imprisonment under the Sentencing Guidelines, but the district court varied below

the guidelines range and imposed a total concurrent sentence of 480 months

imprisonment.

Defendant now raises three issues on appeal.  First, Defendant contends that

the district court erred by permitting, during the testimony of four of the victims,

the introduction of diaries they had created during their time under Defendant's

control.  Second, Defendant contends that the district court erred by denying his

post-trial motion for a new trial based on newly discovered evidence.  Third,

Defendant contends that the district court's sentence was substantively

unreasonable.  After carefully considering the record and the reasoning of the

district court, we AFFIRM the Defendant's conviction and sentence.

## DISCUSSION

### I.    ADMISSION OF DIARY EVIDENCE

At trial, the district court allowed the United States to introduce the diary entries of four of the victim-witnesses. These diary entries included prayers, poems, and other writings made by the victims while they were living with the defendants and engaged in prostitution. We review a trial court's evidentiary rulings under the abuse-of-discretion standard. *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (*en banc*). "[T]he deference that is the hallmark of abuse-of-discretion review requires that we not reverse an evidentiary decision of a district court unless the ruling is manifestly erroneous." *Id.* at 1258 (internal citations and quotation marks omitted).

After considering the district court's evidentiary rulings, we conclude that the district court did not abuse its discretion in admitting the diary evidence. The evidence, which conveyed the mental state of the women, was pertinent to confirming the coercive environment created by Defendant, which fact was relevant in proving the two counts of sex-trafficking by force, fraud, or coercion. As to Defendant's objection on hearsay grounds, many of the entries, such as the prayers, the poems, and the writer's ruminations about life, were not offered for the truth of the matter asserted. Some entries, which expressed the writer's feeling of

9

sadness or loneliness, were admitted for the truth of the matter asserted. But these entries fell under the "state-of-mind" exception set out in Fed. R. Evid. 803(3).

Yet, even assuming, for the sake of argument, that the district court did err by admitting this evidence, Defendant has not shown that the admitted evidence had a "substantial prejudicial effect," which showing is necessary to prompt reversal of the conviction. *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1275 (11th Cir. 2015). "A prejudicial effect is demonstrated when the moving party shows that the error probably had a substantial influence on the jury's verdict." *Id*. (quotation marks omitted).

Here, given the other overwhelming evidence supporting the jury's verdict at trial, Defendant has failed to show that the diary evidence had a substantial influence on the jury's verdict. The diary evidence conveyed the state of mind of the four victims while they were living with the defendants, and was pertinent only to the two counts of sex-trafficking by force, fraud, or coercion. Yet, each diarist also testified directly and in detail about what the defendants did to her and the resulting mental state during their period of captivity. Each woman was subject to cross-examination, not only about what she wrote, but also as to the matters she testified about. And, ultimately, it was the witnesses' credibility about the events they related that mattered. In addition, there was abundant other evidence supporting Defendant's conviction on these two counts. LMJ and RHP (the two

10

victims associated with these counts) provided extensive testimony about the pattern of threats, violence, and emotional coercion that forced them to commit acts of prostitution.  Several other victims corroborated specific and general aspects of this testimony.  Further, besides LMJ and RHP, the seven other victims testified as to the similar force and coercion they had experienced.  Six ICE agents provided testimony about their involvement in the investigation, with each further corroborating various aspects of the victims' testimony.  In addition, two physicians who had treated RHP and LMJ testified and corroborated the women's testimony about specific injuries that Defendant had inflicted on them.  Thus, even assuming there was error in the admission of the diary evidence, "it was harmless in light of the overwhelming evidence establishing [Defendant's] guilt."  *United States v. Hersh*, 297 F.3d 1233, 1254 n.31 (11th Cir. 2002); *see also United States v. Phaknikone*, 605 F.3d 1099, 1109 (11th Cir. 2010); *United States v. Harriston*, 329 F.3d 779, 789 (11th Cir. 2003).

## II.    DEFENDANT'S MOTION FOR NEW TRIAL

Defendant next asserts that the district court erred by denying his motion for a new trial based on newly discovered evidence, pursuant to Fed. R. Crim. P. 33. After trial, Defendant presented the court with proffered testimony from a woman who served as a prostitute under the defendants' supervision.  This woman, who had not testified at trial, refused to return to the United States to testify at an

11

evidentiary hearing, but was deposed in Mexico.  This putative new witness testified that the purported victims had voluntarily engaged in prostitution, but in order to obtain immigration papers allowing them to remain in the United States legally, they only later accused the defendants of forcing them into prostitution. After reviewing the proffered new evidence, the district court denied Defendant's motion.

We review the district court's denial of a Rule 33 motion for new trial under the abuse-of-discretion standard and recognize that "[m]otions for a new trial based on newly discovered evidence are highly disfavored."  *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) (*en banc*) ("[T]he defendant bears the burden of justifying a new trial.").  A motion for new trial based on newly discovered evidence may be granted only if "(1) the evidence was discovered after trial, (2) the failure of the defendant to discover the evidence was not due to a lack of due diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material to issues before the court, and (5) the evidence is such that a new trial would probably produce a different result."  *United States v. Jernigan,* 341 F.3d 1273, 1287 (11th Cir.2003).

The district court did not abuse its discretion by rejecting Defendant's motion for new trial because Defendant did not carry his burden of showing that the newly discovered evidence "would probably produce an acquittal."  *United*

12

*States v. Scrushy*, 721 F.3d 1288, 1304 (11th Cir. 2013). The new evidence was material only to the sex-trafficking by force, fraud, or coercion counts[3] and, as noted, there was overwhelming evidence supporting Defendant's conviction on these counts and contradicting the new witness's allegations. Further, the credibility of this newly offered witness was greatly undermined by the substantial inconsistencies between her present deposition testimony and her earlier affidavit, her prior conversation with defense counsel, and her initial interviews with ICE agents. Indeed, testimony from two ICE officers at the Rule 33 evidentiary hearing contradicted the new witness's testimony. Further, the witness admitted the limitations of her knowledge about the day-to-day lives of the victims. Finally, some of the witness's testimony actually supported the testimony of the victim witnesses, as, for example, her testimony that some victims stated that they wished the police would catch a co-defendant so they could be free and that Defendant had broken RHP's finger on one occasion. In short, the district court did not abuse its discretion by denying Defendant's motion for new trial.

## III.  SUBSTANTIVE REASONABLENESS OF DEFENDANT'S SENTENCE

Finally, Defendant challenges the substantive reasonableness of his sentence. We review the reasonableness of a sentence under a deferential abuse-

---

[3] The new evidence did not contradict trial evidence showing that the victims were illegally brought to the United States to engage in prostitution and that some of the victims were minors when they were brought into the country for this purpose.

13

of-discretion standard, and may "set aside a sentence only if we determine, after giving a full measure of deference to the sentencing judge, that the sentence imposed truly is unreasonable." *United States v. Cavallo*, 790 F.3d 1202, 1236–37 (11th Cir. 2015).  Defendant has the burden of establishing that his sentence was unreasonable.  *Id.*

Based on the district court's calculation, Defendant's guideline range called for a sentence of life imprisonment.  Defendant does not challenge the procedural reasonableness of the sentence, meaning that he does not contest the accuracy of the court's calculation.  The district court, however, did not impose the guidelines sentence of life imprisonment, instead concluding that it was too high.  Instead, the court varied downward to impose a sentence of 480 months imprisonment. Defendant challenges the substantive reasonableness of that sentence on two grounds, meaning that he argues that his sentence was too high.

Section 3553(a) sets out factors that a court should consider in imposing a reasonable sentence.  *See* 18 U.S.C. § 3553(a).  Section 3553(a)(6) instructs a court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Defendant argues that there was an unwarranted disparity between his sentence and the sentences of his co-defendants, under § 3553(a)(6).  He notes that the two other co-defendants who received the harshest sentences were sentenced to only 240 months

14

and 200 months of imprisonment.[4]  From this, he contends that his own sentence was unreasonable.

That Defendant received a harsher sentence than his co-defendants does not mean that his sentence was unreasonable.  In fact, this court has recognized that a "disparity between the sentences imposed on codefendants is generally not an appropriate basis for relief on appeal."  *See United States v. Cavallo*, 790 F.3d 1202, 1237 (11th Cir. 2015) (alterations omitted).  As to this particular case, the district court expressly acknowledged § 3553(a)(6), but found good reason to sentence Defendant more harshly than his co-defendants.  Specifically, the district court cited the numerous allegations of violence against Defendant, Defendant's leadership role,[5] and the fact that Defendant refused to acknowledge his guilt, unlike his co-defendants who pled had guilty.[6]  Indeed, the record contains ample support for the district court's conclusion that Defendant was a leader of the

---

[4]  This court affirmed the substantive reasonableness of these sentences at *United States v. Cortes-Meza*, 411 F. App'x 284, 285 (11th Cir. 2011).

[5]  *See United States v. Mozie*, 752 F.3d 1271, 1289–90 (11th Cir. 2014) (considering the defendant's leadership role in the offense as an appropriate reason for a disparate sentence); *United States v. Hill*, 643 F.3d 807, 885 (11th Cir. 2011) (same); *United States v. Mateos*, 623 F.3d 1350, 1367 (11th Cir. 2010) (same); *United States v. Thomas*, 446 F.3d 1348, 1357 (11th Cir. 2006) (same).

[6]  Although Defendant tried to plead guilty before going to trial, the district court would not accept the plea because the Defendant would not admit that his sex trafficking of the victims was done *against their will*.  The district court reasoned that this "separate[d] [Defendant] from the others" because Defendant "did not fully accept responsibility."

operation and that he had engaged in multiple and serious acts of violence against the women.

Further, "[Defendant] was convicted of more crimes than his codefendants. Defendants convicted of more crimes or more serious offenses naturally receive longer prison sentences than those who pled guilty to fewer or lesser crimes." *United States v. Azmat*, 805 F.3d 1018, 1048 (11th Cir. 2015). The first co-defendant (240 months' imprisonment) pled guilty to only one count of sex trafficking by force, fraud, or coercion and the second (200 months' imprisonment) pled guilty to only one count of sex trafficking of a minor and one count of importing an alien for the purposes of prostitution. Defendant, however, was convicted of 19 criminal counts, including two counts of sex trafficking of a minor; two counts of sex trafficking by force, fraud or coercion; and one count of transporting a minor for purposes of prostitution—each of which allowed for a statutory maximum of life imprisonment.

In addition, the two comparator co-defendants also faced a much lower guidelines range. In fact, the district court had to vary upward to even be able to impose a 240 and 200 month sentence on these co-defendants. Defendant, on the other hand, faced a guidelines sentence of life imprisonment and the court had to vary downward to even be able to impose the 480-month sentence given to him. Because we "ordinarily expect a sentence within the Guidelines range to be

16

reasonable," *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008) (alterations omitted) (quoting *United States v. Talley,* 431 F.3d 784, 788 (11th Cir. 2005)), it stands to reason that the same principle should hold for a sentence in which the court has actually gone *below* the guidelines range.

Finally, even if § 3553(a)(6) weighed in favor of a lower sentence, Defendant does not challenge the district court's consideration of any of the other § 3553(a) factors. Although "sentencing disparities are a concern . . . [,] it is within [the sentencing] court's discretion to decide how much weight to give each of the § 3553 factors as long as it has not committed a clear error of judgment." *United States v. Mateos*, 623 F.3d 1350, 1368 (11th Cir. 2010); *see also Gall v. United States*, 552 U.S. 38, 52 (2007) (instructing sentencing courts to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue") (quotation marks omitted). The district court properly analyzed other § 3553(a) considerations, and did not commit a clear error of judgment when it imposed a 480-month sentence on Defendant. The sentence was within the "range of reasonable sentences from which the district court may choose." *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) (quotation marks omitted).

17

As to Defendant's second argument challenging his sentence, he contends that the district court erred by imposing a 480-month sentence, because such a sentence is a "*de facto* life sentence."  We disagree.  Defendant was not *actually* given a life sentence, although a life sentence was what the guidelines called for, and the district court could certainly have imposed such a sentence.  Put another way, given a choice between a life sentence and a 40-year sentence, there's no question that Defendant would strongly prefer the latter, which fact suggests a distinction between the two.

But fortunately for Defendant, the district court concluded that the guidelines sentence of life imprisonment was not warranted.[7]  Instead, it imposed a sentence that will result in Defendant's eventual release from prison a few days after he turns 69, assuming Defendant earns all of his available good-time credits.  Although no one would consider a 69-year old to be in his salad days, for many people of that age, there can still be hope that some good years lie ahead.  Moreover, as the Supreme Court has recognized, a life sentence is psychologically and substantively different from a term-of-years sentence.  A life sentence "means denial of hope; it means that good behavior and character improvement are

---

[7]  Such a sentence, the district court reasoned, "would be a disparate sentence in this case based upon what the other Defendants have received."  Further, the court concluded, "there's no reason that we should keep you in a United States prison until you die.  That's not something that needs to be done.  At some point you should return to your country and you should spend your last years there."

18

immaterial; it means that whatever the future might hold in store for the mind and spirit of the convict, he will remain in prison for the rest of his days." *Graham v. Florida*, 560 U.S. 48, 70 (2010), *as modified* (July 6, 2010) (alteration and quotation marks omitted). The term-of-years sentence imposed here is admittedly lengthy, but there is a definite release date, at which time, albeit in the later years of his life, Defendant may return to Mexico to live out the rest of his days.

Finally, even if this sentence were considered to be the same as a life sentence, Defendant has not articulated why such a sentence would be substantively unreasonable. Once again, Defendant's guideline sentence called for a term of life imprisonment, and "we ordinarily expect a sentence within the Guidelines range to be reasonable." *Hunt*, 526 F.3d at 746 (quotation marks omitted). That a sentence is a life sentence does not render it automatically unreasonable.[8] We conclude that the district court did not abuse its discretion by imposing a 480-month term of imprisonment.

## CONCLUSION

We **AFFIRM** the Defendant's conviction and sentence.

---

[8] Of note, a number of other courts have refused to find sentences unreasonable simply because these sentences might amount to a *de facto* life sentence. *See United States v. Volpendesto*, 746 F.3d 273, 299 (7th Cir. 2014); *United States v. Vilches-Navarrete*, 523 F.3d 1, 18 (1st Cir. 2008); *United States v. Cramer*, 602 F. App'x 837, 840 (2d Cir. 2015); *United States v. Gross*, 253 F. App'x 264, 267 (4th Cir. 2007).